**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| NASHVILLE SENIOR CARE, LLC, | ) | |
| *et al.*[1] | ) | Case No. 23-02924 (MFH) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

| | | |
|---|---|---|
| | ) | |
| NASHVILLE SENIOR CARE, LLC, | ) | |
| CINCINNATI SENIOR CARE, LLC, | ) | |
| DAYTON SENIOR CARE, LLC, | ) | |
| FLORIDA SENIOR LIVING, LLC, | ) | |
| SEBRING SENIOR LIVING, INC., and | ) | |
| WAYNESBORO HEALTHCARE, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Adversary No. 24- |
| | ) | |
| v. | ) | |
| | ) | |
| NEXUS CAPITAL XIII LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### COMPLAINT FOR DECLARATORY RELIEF

Nashville Senior Care, LLC, Cincinnati Senior Care, LLC, Dayton Senior Care, LLC, Florida Senior Living, LLC, Sebring Senior Living, Inc., and Waynesboro Healthcare, LLC (collectively, "Plaintiffs" or "Sellers") hereby file this Complaint against Defendant Nexus Capital XIII LLC ("Nexus Capital" or "Buyer") seeking a declaration of interest in monies held in escrow. In support thereof, Plaintiffs state as follows:

---

[1] The "Debtors" in the above-captioned jointly administered chapter 11 bankruptcy cases are: Nashville Senior Care, LLC; Cincinnati Senior Care, LLC; Dayton Senior Care, LLC; Florida Senior Living, LLC; Sebring Senior Living, Inc.; Trousdale Issuer, LLC; and Waynesboro Healthcare, LLC.

## NATURE OF THE ACTION

1.       Plaintiffs own and operate residential senior care and nursing facilities and provide related healthcare services at various locations throughout the country. Unfortunately, Plaintiffs' business operations encountered a massive disruption from the COVID-19 pandemic that, when paired with their debt obligations, ultimately could not be overcome. After months of marketing, Plaintiffs accepted a bid from Cascasis LLC ("Cascasis") for the purchase of substantially all of Plaintiffs' assets. Plaintiffs and Cascasis entered into an Asset Purchase Agreement dated August 4, 2023 (the "Stalking Horse APA") and initiated the above-captioned cases under chapter 11 of the Bankruptcy Code on August 14, 2023 in order to facilitate the sale to Cascasis or the highest and best bidder to be identified pursuant to a court-approved overbid and auction process.

2.       Prior to the scheduled auction, Nexus Capital submitted a preemptive bid that exceeded Cascasis's offer by approximately forty percent, but such bid was conditioned on Plaintiffs cancelling the scheduled auction. Nexus Capital also offered to pay an $8 million deposit into an escrow account (as compared to the $2 million deposit funded by Cascasis) as an additional incentive for Plaintiffs to accept the Nexus Capital bid, cancel the auction scheduled in the bankruptcy cases and not move forward with the Stalking Horse APA.

3.       Plaintiffs subsequently accepted Nexus Capital's private sale bid, entered into that certain Asset Purchase Agreement dated October 23, 2023 (the "Nexus APA") with Nexus Capital (which had funded $7.25 million of the deposit into escrow), cancelled the upcoming auction, and filed a motion with the Court seeking approval of the private sale to Nexus Capital in accordance with the terms of the Nexus APA. The Court approved the sale to Nexus Capital in accordance with the terms of the Nexus APA, and Nexus Capital funded the remaining $750,000.00 into the escrow account.

4.     In the intervening months, Nexus Capital repeatedly breached, and failed to fulfill its obligations under, the Nexus APA, including failing to timely file the regulatory approvals necessary to run Plaintiffs' facilities that would allow a closing to occur within the timeframe established in the Nexus APA. Rather than remedy its many breaches (of which ample notice was provided), Nexus Capital allowed the Condition Satisfaction Date, *i.e.* February 6, 2024, to lapse without compliance and without seeking to extend such date.

5.     Consequently, on February 7, 2024, Plaintiffs exercised their termination rights under the Nexus APA as a result of Nexus Capital's failure to fulfill its obligations. Plaintiffs also asserted their rights under the Nexus APA to retain the full amount of the Escrow Deposit as liquidated damages for Nexus Capital's effective termination of and breaches under the Nexus APA. Nexus Capital, however, objected to Plaintiffs' termination and receipt of the Escrow Deposit, so the funds are being held by the Escrow Agent subject to further order of the Court.

6.     As such, a bona fide dispute exists between the parties. Plaintiffs seek a declaratory judgment that Plaintiffs are entitled to retain the Escrow Deposit of $8 million presently held pursuant to the terms of the Nexus APA and related Escrow Agreement as damages for Nexus Capital's breaches of the Nexus APA.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and Section 9.10(b) of the Nexus APA. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).

8.     Venue is proper under 28 U.S.C. § 1409 and Section 9.10(b) of the Nexus APA.

9.     The Court may determine interests in property and grant the requested declaratory relief pursuant to 28 U.S.C. § 2201(a) and 11 U.S.C. § 105(a), and such relief is properly sought

in an adversary proceeding pursuant to Rules 7001(2) and 7001(9) of the Federal Rules of Bankruptcy Procedure.

10.     Nexus Capital has consented to the jurisdiction of the Court pursuant to Section 9.10(b) of the Nexus APA and in accordance with Paragraph 59 of the Sale Order.

## THE PARTIES

11.     Each Plaintiff is a limited liability company or corporation organized under the laws of the State of Tennessee or Florida, as applicable.

12.     Upon information and belief, defendant Nexus Capital is a limited liability company organized under the laws of the state of Delaware.

## BACKGROUND

13.     Plaintiffs are engaged in the business of the ownership and operation of residential senior care and nursing facilities and the provision of related healthcare services at various locations throughout the country (collectively, the "Facilities"). Their business operations are regulated by local, state, and federal law and are conducted under licenses issued by Ohio, Tennessee, and Florida.

14.     Plaintiffs were severely impacted by the COVID-19 pandemic, which caused a decline in the resident census across all of the Facilities. But, even before COVID-19, Plaintiffs experienced liquidity issues and rising healthcare costs, leaving them unable to complete necessary capital expenditures and upgrade certain Facilities.

15.     The COVID-19 pandemic had a negative impact across the Facilities. After the initial spate of lockdowns in the spring of 2020, resident census declined negatively impacting revenues.

16.     Moreover, both operating and labor costs rose dramatically following the onset of the pandemic, which exacerbated the negative liquidity impact of the decline in census levels. Plaintiffs were unable to make needed capital investments and operational expenditures at certain of their Facilities, which impaired their ability to improve financial performance. This difficult combination of rising costs and a lower census, coupled with a high debt load from their financing, led Plaintiffs to pursue strategic alternatives to maximize value.

17.     In July 2022, Plaintiffs retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey") as their investment banker to assist with strategic alternatives.

18.     Beginning in September 2022, Houlihan Lokey engaged in a prepetition marketing process with potential strategic and financial buyers to solicit interest in Plaintiffs' business. After a thorough pre-petition marketing process, Plaintiffs received an actionable offer from Cascasis.

19.     On August 4, 2023, Plaintiffs and Cascasis entered into the Stalking Horse APA under which Cascasis agreed to purchase substantially all of Plaintiffs' assets for $41,000,000.00, subject to higher and better offers.

20.     On August 14, 2023, Plaintiffs filed voluntary petitions for relief under chapter 11 title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") to, among other things, facilitate the sale of Plaintiffs' business to Cascasis, subject to higher and better offers.

21.     Plaintiffs' chapter 11 cases are jointly administered and pending in the Court in the cases captioned *In re Nashville Senior Care, LLC, et al.*, Case No. 23-02924 (MFH) (Jointly Administered) (the "Chapter 11 Cases").

22.     Plaintiffs are authorized to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

23.     On September 19, 2023, the Bankruptcy Court entered an order setting a bid deadline and a date for auction, and establishing procedures governing the marketing, auction, and sale of the assets (the "Bidding Procedures Order") (ECF No. 198).

### Nexus Capital Submits the Winning Bid

24.     Prior to the auction, Plaintiffs received a preemptive, economically superior offer from Nexus Capital for the same assets being acquired by Cascasis. Nexus Capital offered to purchase the assets for $57,500,000.00 plus the assumption of certain liabilities – a more than 40% increase over Cascasis's offer set forth in the Stalking Horse APA.

25.     Nexus Capital's offer, however, was contingent upon Plaintiffs cancelling the auction process in the Chapter 11 Cases and immediately moving forward with the private sale of Plaintiffs' assets.

26.     As an additional incentive for Plaintiffs' agreement to cancel the auction process in favor of private sale, Nexus Capital agreed to deposit $7,250,000 in an escrow account upon execution of a purchase agreement, which would increase to $8,000,000 upon entry of an order approving the sale (the "Escrow Deposit").

27.     On October 23, 2023, Plaintiffs and Nexus Capital entered into the Nexus APA in which Nexus Capital agreed to purchase substantially all of Plaintiffs' assets. A copy of the Nexus APA is attached hereto as **Exhibit A**.

28.     Plaintiffs and Nexus Capital also entered into an Escrow Deposit Agreement regarding the handling of the Escrow Deposit. A true and correct copy of the Escrow Deposit Agreement is attached hereto as **Exhibit B**.

29.     On October 24, 2023, Plaintiffs, in accordance with Nexus Capital's requirement, cancelled the auction ("Notice of Auction Cancellation") (ECF No. 324).

30. On November 6, 2023, Plaintiffs and Cascasis entered into an agreement in which Cascasis agreed to be the "Backup Bidder" as that term is defined in the Bid Procedures Order, and the parties executed that certain Second Amendment to Asset Purchase Agreement, dated November 6, 2023 (the "Second Amendment", and with the Stalking Horse APA, the "Backup Bidder Agreement"). (ECF No. 359).

31. The Backup Bidder Agreement provides that Cascasis has authority to terminate the Back-Up Bidder Agreement if Plaintiffs do not accept the back-up bid within one hundred and twenty (120) days following the date of the Sale Order (*i.e.*, March 7, 2024). (ECF No. 359 at 2(G)).

32. On November 8, 2023, the Bankruptcy Court entered an order (i) authorizing the private sale of substantially all of Plaintiffs' assets to Nexus Capital free and clear of all liens, claims, encumbrances, and interests; (ii) authorizing Plaintiffs to assume and assign certain executory contracts and unexpired leases; and (iii) granting other related relief (the "Sale Order"). (ECF No. 366).

33. Upon entry of the Sale Order (and as required pursuant to Paragraph 51 of the Sale Order), Nexus Capital deposited the additional $750,000 into the escrow account.

34. The Sale Order also approved the Backup Bidder and provided, among other things, that Plaintiffs are entitled to "consummate the sale of the Purchased Assets to the Backup Bidder in accordance with the terms of the Backup Bidder Agreement" in the event Nexus Capital "cannot or refuses to consummate the Sale in accordance with the [Nexus APA]." (ECF No. 366 at ¶ 44).

## The Nexus APA

35.     The Nexus APA governs the agreement between Plaintiffs and Nexus Capital regarding the terms of the sale, including, without limitation, delineation of the assets purchased, liabilities assumed, and purchase price. (*See* Ex. A).

36.     In particular, Nexus Capital agreed to pay Plaintiffs an aggregate sum of $57,500,000 (the "Purchase Price") for all real property, tangible property used in the operation of Plaintiffs' business (including the Facilities), intangible property rights related to each business location, commercial occupancy leases, assumed contracts, and National Provider Numbers and any other applicable provider numbers with any state or other issuer of governing body, amongst other things (the "Purchased Assets"). (Ex. A at 2.01, 2.05).

37.     The parties agreed that payment of the Purchase Price would be made as follows:

> (a) A deposit in the amount of $7,250,000 (the "**Initial Escrow Deposit**") shall be delivered by Buyer to Escrow Agent on the Execution Date pursuant to the terms and conditions of the Escrow Deposit Agreement in the form of **Exhibit D** (the "**Escrow Deposit Agreement**"). Within one (1) business day after the entry of the Sale Order, a deposit in the amount of $750,000 (the "**Second Escrow Deposit**", and together with the Initial Escrow Deposit, collectively, the "**Escrow Deposit**") shall be delivered by Buyer to Escrow Agent pursuant to the Escrow Deposit Agreement. Closing or termination of this Agreement, whether prior to or after the commencement of the Bankruptcy Case, the Escrow Deposit, together with accrued interest thereof, shall be delivered to Seller or Buyer in accordance with the terms herein that are applicable to the Escrow Deposit.

> (b) Payment of the remaining amount of the Purchase Price plus or minus prorations or adjustments herein set forth shall be paid by Buyer at the Closing by wire transfer to Escrow Agent (the "**Purchase Price Balance**").

> Ex. A at 2.05 (emphasis in original).

38.     The Nexus APA also contained certain representations, warranties, and covenants governing the parties' conduct between the execution and consummation of the Nexus APA. (Ex. A at Arts. IV, V, VI).

39. For example, Plaintiffs agreed to permit Nexus Capital and its Representatives[2] to access, inspect, and appraise Plaintiffs' real property, properties, assets, premises, books and records, and contracts during regular business hours. (Ex. A at Section 6.02).

40. In addition, Nexus Capital was required to file certain regulatory notices and applications within ten (10) days of the entry of the Sale Order (*i.e.*, November 18, 2023):

> Additionally, Buyer shall, within ten (10) days after entry of the Sale Order, submit the necessary applications to the applicable regulatory authorities to obtain such Permits and Regulatory Approvals as are needed to consummate the sale (with copies of such applications promptly provided to Sellers) and shall diligently and expeditiously follow up on and pursue such Permits and Regulatory Approvals. Notwithstanding anything contained herein, upon written notice by Buyer to Sellers delivered prior to the then-scheduled Condition Satisfaction Date, Buyer may on a single instance, extend the Condition Satisfaction Date by a period not to exceed thirty (30) days if, despite using diligent and continuous efforts to obtain such Permits and Regulatory Approvals as are needed to consummate the sale, it reasonably appears that the Permits and Regulatory Approvals will not be issued prior to the then-scheduled Condition Satisfaction Date.

> Ex. A at Section 6.08.

41. The parties' respective obligations to close the transaction pursuant to the Nexus APA were subject to the other party's fulfillment of the requisite covenants and obligations prior to the Closing Date. (Ex. A at Art. VII).

42. Plaintiffs' obligation to close the transaction was therefore subject to Nexus Capital's compliance with all conditions and covenants, including its timely filing for, and receipt of, all permits and regulatory approvals set forth in the Nexus APA. (Ex. A at Sections 7.01(c), 7.03(c)).

43. Section 8.01(c) of the Nexus APA granted Plaintiffs the right to terminate the APA if Nexus Capital failed to fulfill its obligations under Article VII of the Nexus APA, including

---

[2] The Nexus APA defines "Representative" as all directors, officers, employees, consultants, financial advisors, counsel, accounts, and other agents.

obtaining the requisite regulatory approval, by the Condition Satisfaction Date (*i.e.* February 6, 2024).[3]

44.     In the event of a termination pursuant to Section 8.01(c), Plaintiffs were entitled to retain the Escrow Deposit as liquidated damages:

> (c)     in the event of Sellers' termination pursuant to **Section 8.01(c)(i), 8.01(c)(ii), 8.01(c)(iii)** or **8.01(e)(iii)**(subject to such failure to meet a condition or such delay under **8.01(c)(ii), 8.01(c)(iii)** or **8.01(e)(iii)** being a result of Buyer's breach), Sellers shall, following Seller's delivery of written notice of termination to Buyer and Escrow Agent and subject to the terms of the Escrow Deposit Agreement, retain the Escrow Deposit as liquidated damages and as Sellers' sole and exclusive remedy with respect to this Agreement and the transactions contemplated herein (Sellers and Buyer agree that Sellers' actual damages in the event of a failure to consummate this sale due to Buyer's default would be extremely difficult or impracticable to determine, and that the amount of the Escrow Deposit is a reasonable estimate of the damages that Sellers would incur in such event);that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

Ex. A at Section 8.02(c) (emphasis in original).

### The Escrow Deposit Agreement

45.     In conjunction with the Nexus APA, Plaintiffs, Nexus Capital, and First American Title Insurance Company ("Escrow Agent") entered into the Escrow Deposit Agreement. (Ex. B).

46.     The Escrow Deposit Agreement governs the Escrow Agent's duties and handling of Nexus Capital's deposit of $8,000,000 (the "Escrow Deposit"). (Ex. B).

47.     More specifically, the parties agreed that, in the event of termination by Plaintiffs based upon a breach by Nexus Capital, the Escrow Deposit would be handled as follows:

> (b)     In the event Buyer defaults with respect to its obligations under the APA, and such default gives rise to the rightful termination by Seller of the APA, as contemplated by Section 8.02(c) of the APA, Escrow

---

[3] The Condition Satisfaction Date is defined as ninety (90) days following the date on which the Sale Order is entered. (Ex. A at 8.01(b)(ii)). Because the Sale Order was entered on November 8, 2023, the Condition Satisfaction Date was February 6, 2024. Nexus Capital failed to obtain any extension of the Condition Satisfaction Date.

Agent shall deliver the Escrow Deposit to Seller upon the receipt of a notice of termination of APA and written direction from Seller and to each of Escrow Agent and Buyer for such disbursement in accordance with Section 8.02(c) of the APA. Buyer shall have three (3) business days to challenge the written direction and disbursement to Seller by delivering a written notice of challenge to Seller and Escrow Agent. If such challenge is timely delivered, then Escrow Agent shall withhold such disbursement until either (i) both Seller and Buyer jointly issue written disbursement instructions to Escrow Agent, or (ii) Escrow Agent is provided a final order from a Court of Competent Jurisdiction providing direction on the disbursement instructions.

Ex. B at 2(a), (b).

### Due Diligence Materials and Site Visits

48.     Prior to executing the Nexus APA, Plaintiffs gave Nexus Capital access to voluminous documents in the virtual data room and provided Nexus Capital with other various documents related to the operations and financial conditions of the business. (Ex. A at Section 5.06).

49.     Thereafter, Plaintiffs continued to cooperate in providing information to Nexus Capital upon request, however Plaintiffs were "under no obligation to create documents or provide any related documents which are outside those in the possession of [Plaintiffs]." (Ex. A at Section 5.06).

50.     Between November 20 and November 28, 2023, Plaintiffs continued to provide Nexus Capital with a wide variety of financial and operational diligence information, including approximately 176 pages of requested information through the online data site which included updated financial statements, payroll registers, example floor plans, and depreciation reports, and numerous email exchanges.

51. Moreover, up to and through the date of termination of the Nexus APA, Plaintiffs continued to supplement Nexus Capital's ongoing document and data requests and, at all times, fully complied with their contractual obligations to provide the same.

52. Plaintiffs also arranged numerous site tours for Nexus Capital and its alleged Representatives pursuant to section 6.02 of the Nexus APA. (Ex. A at Section 6.02).

53. For example, on November 27, 2023, at the request of Nexus Capital, Steven Friedman and Naomi Halpert, along with Ben Ilhardt from Houlihan Lokey, visited the McKendree Village property and had an opportunity to inspect the facility (the "November 27 Site Visit").

54. Likewise, on November 28, 2023, at the request of Nexus Capital, Steven Friedman and Naomi Halpert along with Ben Ilhardt from Houlihan Lokey visited the Waynesboro Health and Rehab Center property and had an opportunity to inspect the facility (the "November 28 Site Visit"). In the course of the November 27 Site Visit and the November 28 Site Visit, Naomi Halpert indicated to Ben Ilhardt that her organization, Ness Healthcare, had been contacted by Nexus Capital about the opportunity to purchase the Sellers' Facilities in Tennessee.

55. Remarkably, and consistent with Ms. Halpert's statements on November 28, as requests for site visits continued to increase, it became apparent that Nexus Capital was requesting visits for individuals that, upon information and belief, were not Representatives (as defined in the Nexus APA), but rather, potential *subsequent purchasers* with whom Nexus Capital was engaged in preliminary marketing.

56. For example, on December 4, 2023, at the request of Nexus Capital, Josef Cukier and one of his colleagues, along with Jack Zylke from Houlihan Lokey, visited the Palms of Sebring property and had an opportunity to inspect the facility. Nexus Capital did not identify the

organization these individuals were employed by, but during the visit Josef Cukier indicated to Jack Zylke that he represented Vivo Healthcare.

57.     On December 6, 2023, at the request of Nexus Capital, Scott Bidwell, along with Andrew Turnbull of Houlihan Lokey, visited the Waynesboro Health and Rehab Center property and had an opportunity to inspect the facility (the "December 6 Site Visit"). Nexus Capital did not identify the organization that Scott Bidwell was employed by, but during the December 6 Site Visit Scott Bidwell indicated to Andrew Turnbull that he worked for National Healthcare Corporation and was evaluating a potential purchase of the facility.

58.     On December 21, 2023, at the request of Nexus Capital, Andrew Feig, along with Ben Ilhardt of Houlihan Lokey, visited the McKendree Village property and had an opportunity to inspect the facility (the "December 21 Site Visit"). While Nexus Capital only identified Andrew Feig, an employee of Cedar Healthcare, as an attendee in advance of the tour, Andrew Feig brought with him a local real estate broker and two separate groups of individuals, some of whom indicated to Ben Ilhardt during the tour that they were potential buyers of portions of the Facilities.

59.     On January 9, 2024, at the request of Nexus Capital, Alex Malech and Dave Alexander, along with Andrew Turnbull of Houlihan Lokey, visited the Friendship Village property and had an opportunity to inspect the facility. Representatives of Nexus Capital originally indicated Alex Malech was associated with Volare Healthcare, but subsequently indicated after inquiry from the Sellers that he was employed by Boulevard Health. Alex Malech indicated he would be bringing along Dave Alexander, who was employed by MajesticCare.

60.     The requests for non-Representative visits continued through the month, and, as late as February 6, 2024, at the request of Nexus Capital, Sellers facilitated a tour of the McKendree Village property. Nexus Capital's initial requested attendee list for this visit was seven individuals

from five different organizations, who were described by Nexus Capital as a "funding partner/source." Two additional individuals, one of which (Adam Klenk of Capstone Companies) was a local real estate broker, were subsequently requested by Nexus Capital to join the tour as an alleged joint venture partner. However, on the day of the tour, approximately twenty individuals were brought to tour the property. Ben Ilhardt of Houlihan Lokey was on-site for this visit, but was not provided with a listing of all names or employing organizations.

### Nexus Capital Repeatedly Breaches the Nexus APA

61. Above and beyond abusing the site tour diligence provision to run an alternative marketing process, almost immediately after the entry of the Sale Order, Nexus Capital breached the Nexus APA, setting the tone for the following ninety days of repeated and ongoing breaches.

62. Nexus Capital was required to submit necessary applications by November 18, 2023 to regulatory authorities to obtain permits and regulatory approvals necessary to close the sale. (Ex. A at Section 6.08).

63. Nexus Capital failed to submit the requisite applications in clear breach of the Nexus APA.

64. Accordingly, on November 20, 2023, counsel for Plaintiffs notified Nexus Capital, via its counsel, that it was in breach of Section 6.08 of the Nexus APA. A copy of the November 20, 2023 correspondence is attached hereto as **Exhibit C**.

65. Nexus Capital was required to cure its breach by November 30, 2023. (Ex. A at Section 8.01(c)(i)).

66. On November 29, 2023, Plaintiffs agreed to delay declaring Nexus Capital in default of the Nexus APA if Nexus Capital filed certain licenses and provided proof of those filings by December 4, 2023.

67.     Nexus Capital failed to provide the requisite proof on or before December 4, 2023.

68.     On January 3, 2024, Plaintiffs again notified Nexus Capital that it remained in breach of its obligations to timely file all regulatory notices. A copy of the January 3, 2024 correspondence is attached hereto as **Exhibit D**.

69.     In this same correspondence, Plaintiffs informed Nexus Capital of its discovery that Nexus Capital misrepresented the nature of the touring parties during the December 6 and December 21 Site Visits described above. *Id.*

70.     On January 16, 2024, Plaintiffs sent yet another notice to Nexus Capital that it remained in continuous breach of the Nexus APA by its untimely regulatory filings and outright failure to submit the requisite regulatory filings for the Florida home health business, which was part of the assets being purchased in the Nexus APA. A copy of the January 16, 2024 correspondence is attached hereto as **Exhibit E**.

71.     Despite uncertainty about Nexus Capital's ability to uphold its obligations under the Nexus APA, Plaintiffs still attempted to work toward closing. Plaintiffs offered to postpone termination of the Nexus APA if Nexus Capital executed an amendment providing for (a) bifurcated closing of the Florida home health business and all other assets, (b) a requirement to close on the non-home health assets by March 1, 2024 or release the $8 million deposit to Sellers, and (c) the option for Nexus Capital to purchase the Florida home health business through May 2, 2024. *Id.*

72.     Rather than accepting Plaintiffs' proposal, on January 24, 2024, Nexus Capital spuriously accused Plaintiffs of delaying Nexus Capital's regulatory filings by refusing to cooperate and by failing to provide outstanding information necessary for the submissions. A copy of Nexus Capital's January 24, 2024 correspondence is attached hereto as **Exhibit F**.

73.     That evening, counsel for Nexus Capital and Plaintiffs conferred via Zoom. Counsel for Plaintiffs rejected the accusations and asked Nexus Capital to commit to an actual, reliable closing date in an effort to protect Plaintiffs from a situation where the back-up bid expires before the close of the transaction.

74.     Counsel for Nexus Capital responded by claiming that outstanding requests for information prevented Nexus Capital from committing to an outside date.

75.     In reality, however, none of the outstanding information identified in the correspondence impacted Nexus Capital's ability to close the transaction or submit its regulatory filings. Rather, the outstanding requests for information were follow-up requests from regulatory authorities regarding applications *already filed* and/or 60-day or other notice periods for which the clock had already started. Since the execution of the Nexus APA, Plaintiffs have fully complied with all information and diligence requests.

76.     On January 26, 2024, Plaintiffs provided all outstanding information requested by Nexus Capital, yet Nexus Capital did not agree to a closing date.

77.     On January 28, 2024, counsel for Plaintiffs requested Nexus Capital's prompt commitment to a firm closing date and acknowledgment that failure to close by that date would result in forfeiture of the Escrow Deposit to Plaintiffs. A copy of the January 28, 2024 correspondence is attached hereto as **Exhibit G**.

78.     Even as late as February 6, 2024, Plaintiffs scheduled a site visit at the McKendree facility. Nexus Capital brought approximately twenty individuals to that site visit - so many that neither Plaintiffs nor Houlihan Lokey could determine who was an actual Representative of Nexus Capital, a potential purchaser, or a potential operator.  Even at this late date in the process (nearly 90 days after the Sale Order was entered), it was clear that Nexus Capital was nowhere near being

in a position to be able to close the sale timely under the terms of the Nexus APA, which was further evidenced by Nexus Capital not even seeking to extend the Condition Satisfaction Date.

79.     Nexus Capital never committed to a closing date.

80.     On February 6, 2024, the Condition Satisfaction Date lapsed with Nexus Capital in continued breach of its obligations and covenants set forth in the Nexus APA and without Nexus Capital seeking to extend such date.

81.     Consequently, on February 7, 2024, Plaintiffs exercised their rights to terminate the Nexus APA based on Nexus Capital's failure to satisfy its obligations and its repeated breaches of the Nexus APA. A copy of the Termination Notice is attached hereto as **Exhibit H.**

82.     More specifically, Plaintiffs terminated the Nexus APA pursuant to section 8.01(c)(ii) for Nexus Capital's failure to fulfill the conditions set forth in Section 7.01 – receipt of all permits and regulatory approvals set forth on Schedule 4.11(a) – by the Condition Satisfaction Date. (Ex. H).

83.     Plaintiffs also terminated the Nexus APA pursuant to section 8.01(c)(i) for Nexus Capital's multiple breaches of the Nexus APA and failures to perform certain representations, warranties, covenants and agreements. (Ex. H).

84.     In addition, Plaintiffs terminated the Nexus APA pursuant to section 8.01(c)(iii) because certain conditions in section 7.03 were not fulfilled by the Condition Satisfaction Date, including without limitation the requirements and obligations under sections 7.03(b) and 7.03(c), such as failure to timely file for the Permits and Regulatory Approvals by the deadline set forth in the Nexus APA and other events that Nexus Capital failed and/or was otherwise unable to cure despite having received written notice of such breaches more than ten days prior.  (Ex. H).

85.     Pursuant to section 8.02(c) of the Nexus APA, Plaintiffs, after delivery of written notice of termination to Nexus Capital and the Escrow Agent, are authorized to retain the full amount of the Escrow Deposit as liquidated damages for the termination. (Ex. H at 8.02(c)).

86.     Plaintiffs provided written notice, in compliance with section 8.02(c) of the Nexus APA, to the Escrow Agent via email on February 7, 2024. A copy of the Notice to Escrow Agent is attached hereto as **Exhibit I**.

87.     On February 7, 2024, Nexus Capital contested Plaintiffs' retention of the Escrow Deposit with the Escrow Agent, see **Exhibit J**.

88.     By the terms of the Escrow Agreement, the Escrow Deposit is being held by the Escrow Agent pending further order of the Court.

## COUNT I
## Declaration of Rights to Escrow Deposit

89.     Plaintiffs reincorporate and re-allege the allegations set forth in paragraphs 1 through 88 as if set forth fully herein.

90.     Section 8.02 of the Nexus APA provides that, upon Plaintiffs' termination pursuant to sections 8.01(c)(i), (ii), or (iii) and written notice to Nexus Capital and the Escrow Agent in light of Nexus Capital's breaches, Plaintiffs shall retain the Escrow Deposit as liquidated damages. (Ex. A at Section 8.02(c)).

91.     Plaintiffs terminated the Nexus APA pursuant to Sections 8.01(c)(ii), as well as sections (i) and (iii) and provided written notice to Nexus Capital and the Escrow Agent. (Ex. H and I).

92.     Nexus Capital disputes that Plaintiffs are entitled to retain the Escrow Deposit. (Ex. J).

93.     Accordingly, there is a bone fide dispute and actual controversy between the parties as to their respective interest in and rights to the Escrow Deposit.

94.     The Declaratory Judgment Act provides in relevant part:

> In a case of actual controversy within its jurisdiction ..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

95.     Plaintiffs now seek, pursuant to 28 U.S.C. § 2201(a), a declaration by the Court that, as a result of Nexus Capital's breach of the Nexus APA, and Plaintiffs' proper termination notice to Nexus Capital and proper notice to the Escrow Agent thereof, Plaintiffs are entitled to the immediate receipt of the Escrow Deposit.

WHEREFORE, Plaintiffs respectfully request that the Court enter a judgment in its favor and against Nexus Capital providing:

A.   Declaratory judgment that: (i) Nexus Capital breached the Nexus APA; (ii) Plaintiffs are entitled to immediate receipt of the Escrow Deposit as liquidated damages thereunder; and (iii) Nexus Capital has no further interest in the Escrow Deposit;

B.   Direction to the Escrow Agent to immediately remit the Escrow Deposit to Plaintiffs; and

C.   Such other and further relief as the Court deems equitable and just.

*[The remainder of this page is intentionally left blank.]*

Date: February 13, 2024

Respectfully Submitted,

*/s/ Robert J. Gonzales*
Robert J. Gonzales (robert@emerge.law)
Nancy B. King (nancy@emerge.law)
EmergeLaw, PLC
4235 Hillsboro Pike, Suite 300
Nashville, Tennessee 37215
(615) 815-1535

- and -

**MCDONALD HOPKINS LLC**
Micah E. Marcus (admitted *pro hac vice*)
MCDONALD HOPKINS LLC
300 North LaSalle Street, Suite 1400
Chicago, Illinois 60654
Telephone: (312) 642-2141
Email: mmarcus@mcdonaldhopkins.com

-and-

Shawn M. Riley (admitted *pro hac vice*)
Scott N. Opincar (admitted *pro hac vice*)
Michael J. Kaczka (admitted *pro hac vice*)
Maria G. Carr (admitted *pro hac vice*)
600 Superior Avenue, E., Suite 2100
Cleveland, Ohio 44114
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
Email: sriley@mcdonaldhopkins.com
    sopincar@mcdonaldhopkins.com
    mkaczka@mcdonaldhopkins.com
    mcarr@mcdonaldhopkins.com

*Counsel to the Debtors and Debtors-in-Possession*

**EXHIBIT A**

**NEXUS APA**

## **EXHIBIT B**

## **ESCROW DEPOSIT AGREEMENT**

**<u>EXHIBIT C</u>**

**NOVEMBER 20, 2023 CORRESPONDENCE**

# EXHIBIT D

## JANUARY 3, 2024 CORRESPONDENCE

**EXHIBIT E**

**JANUARY 16, 2024 CORRESPONDENCE**

## **EXHIBIT F**

**JANUARY 24, 2024 CORRESPONDENCE**

# EXHIBIT G

## JANUARY 28, 2024 CORRESPONDENCE

**EXHIBIT H**

**TERMINATION NOTICE**

## EXHIBIT I

### NOTICE TO ESCROW AGENT

**<u>EXHIBIT J</u>**

**EMAIL FROM COUNSEL FOR NEXUS CAPITAL CONTESTING PLAINTIFFS'
RETENTION OF THE ESCROW DEPOSIT**